## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**JUDYANN MORALES-RAMOS**, *et al.*,

      Plaintiffs,

      v.

**HOSPITAL EPISCOPAL SAN LUCAS GUAYAMA, INC.**, *et al.*,

      Defendants.

Civil No. 13-1614 (BJM)

## OPINION AND ORDER

This case involves a pregnant woman, Judyann Morales-Ramos ("Morales"), who was transferred to the University District Hospital at the Puerto Rico Medical Center ("University Hospital") sometime after she arrived to the Hospital Episcopal San Lucas Guayama, Inc. ("Hospital") and was examined by Dr. Alberto Matos-Guadalupe ("Dr. Matos"). Docket No. 38 ("Am. Compl."). Morales and Angel Adorno-Morales, individually and on behalf of their minor son, A.M.A.M., brought this action against the Hospital, Dr. Matos, and their insurance carriers, alleging violations of the Emergency Medical Treatment and Labor Act ("EMTALA" or the "Act"), 42 U.S.C. §§ 1395dd(a),(b), and medical malpractice under Article 1802 of the Puerto Rico Civil Code. P.R. Laws Ann. tit. 31, § 5141. The Hospital and Dr. Matos moved for summary judgment, Docket Nos. 65, 78, 112, 119, and Morales opposed. Docket Nos. 95, 116.

For the reasons set forth below, the motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if it "is one that could be resolved in favor of either party." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir.

2004). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions" of the record materials "which it believes demonstrate the absence" of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The court does not act as trier of fact when reviewing the parties' submissions and so cannot "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon" conflicting evidence. *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987). Rather, it must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. But the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and may not rest upon "conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

## BACKGROUND

Except where otherwise noted, the following facts are drawn from the parties' Local Rule 56[1] submissions.[2]

---

[1] Local Rule 56 is designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." *CMI Capital Market Inv. v. Gonzalez-Toro*, 520 F.3d 58, 62 (1st Cir. 2008). It requires a party moving for summary judgment to accompany its motion with a brief statement of facts, set forth in numbered paragraphs and supported by citations to the record, that the movant contends are uncontested and material. D.P.R. Civ. R. 56(b), (e). The opposing party must admit, deny, or qualify those facts,

### Morales's Medical Background

In March 2012, Morales was admitted to the Hospital when her gynecologist, Dr. Gustavo Sanchez ("Dr. Sanchez"), found that she developed "shortness of cervix incompetence." SUF ¶ 3; OSF ¶ 3. Around that time, Morales reported that she suffered from Hermansky-Pudlak Syndrome, albinism, easy bleeding with minor trauma, and asthma. SUF ¶ 4; OSF ¶ 4. Dr. Gonzalez,[3] a hematologist at the Hospital, recommended treatment to correct Morales's coagulopathy. Docket No. 106-2; ASF ¶ 24. Her bleeding time did not improve, and so Dr. Sanchez decided to transfer Morales to the University Hospital after noting the Hospital's "limitation" to assist her. SUF ¶ 7; OSF ¶ 7.

Dr. Sanchez explained "very carefully" to Morales and her husband, who understood the "case and the degree of complexity," that it would be "best" to transfer her to the University Hospital, which has a 24-hour blood bank, 24-hour hematologic service, and maternal-fetal medicine department. SUF ¶¶ 7, 8; OSF ¶¶ 7, 8. Dr. Sanchez called the University Hospital's obstetrics and gynecology ("OB/GYN") department, and the transfer was accepted. Morales was considered a "complex obstetric patient," and began

---

with record support, paragraph by paragraph. *Id.* 56(c), (e). The opposing party may also present, in a separate section, additional facts, set forth in separate numbered paragraphs. *Id.* 56(c). While the "district court may forgive a party's violation of a local rule," litigants ignore the Local Rule "at their peril." *Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 219 (1st Cir. 2007).

[2] Defendants' Statement of Uncontested Facts ("SUF"), Docket No. 65 at 2–6; Plaintiffs' Opposing Statement of Facts ("OSF"), Docket No. 96 at 1–4; Plaintiffs' Additional Statement of Facts ("ASF"), Docket No. 96 at 4–10; Defendants' Reply Statement of Facts ("RSF"), Docket No. 109; and Plaintiffs' Surreply Statement of Facts ("SSF"), Docket No. 116 at 6–13. I note that the RSF raises many frivolous objections, including a repeated argument that medical opinions may not be considered at this stage. *See, e.g.*, *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993) ("nonmovants may rely on the affidavits [or testimony] of experts in order to defeat a motion for summary judgment"). The argument is particularly meritless in this case because, as a general matter, such testimony is necessary to establish certain elements of an EMTALA claim. *See, e.g.*, *Ortiz–Lopez v. Sociedad Española de Auxilio Mutuo y Beneficiencia de P.R.*, 248 F.3d 29, 36–37 (1st Cir. 2001).

[3] Dr. Gonzalez's first name was not specified in the form documenting his recommendation. Docket No. 106-2.

receiving prenatal care at the University Hospital after April 2012. SUF ¶¶ 10, 11; OSF ¶¶ 10, 11.

### *Alleged Deviations from Hospital Protocol*

On August 10, 2012, Morales had completed 37 weeks of her pregnancy and arrived to the Hospital's emergency room at 1:50 a.m. suffering from vaginal bleeding and pelvic pain. Docket No. 106-6 at 1, 19. She voiced both of these two symptoms upon arrival, and they were documented in her medical record. RSF ¶ 4; Docket No. 106-6 at 1, 19. At 3:30 a.m., Morales was transferred to the University Hospital after being seen by Dr. Matos and the Hospital's medical staff. ASF ¶ 15; RSF ¶15. Morales asserts that the Hospital deviated from its standard screening and transfer procedures during her visit on August 10, and marshals various examples in support of this assertion.

At the outset, Morales highlights that on August 10—according to Dr. Matos—the Hospital had an OB/GYN department, delivery rooms, pediatrician services, operation rooms, and a blood bank. SAF ¶ 25. In contrast, the operational executive director for the Hospital, Elyonel Ponton-Cruz ("Ponton"), certified in May 2016 that the Hospital "does not have" a blood bank, and that this service is subcontracted when it is needed.[4] Docket No. 121-9 at 1.

According to Dr. Matos, a patient's vital signs are checked and documented when the patient arrives to the Hospital, at each "intervention" by either a nurse or doctor, and before the patient is transferred to another hospital. Docket No. 106-19 at 1. Morales's vital signs were checked and documented upon her arrival to the Hospital's emergency room. ASF ¶ 10; Docket No. 106-6 at 20. They were also documented when she was transferred at 3:30 a.m. ASF ¶ 35. On the other hand, the nurses' notes that were entered at 2:15, 2:30, and 2:57 a.m. do not document Morales's vital signs. ASF ¶ 13. Dr. Matos also did not document Morales's vital signs at 2:30 a.m. Docket No. 106-6 at 5.

---

[4] I note that Ponton's certification does not speak to whether the Hospital had a blood bank on August 10, 2012—as the certification subscribed in May 2016 is written in present tense.

It is also "protocol," according to Dr. Matos, to connect a fetal monitor to "every pregnant woman with over twenty weeks of gestation." Docket No. 106-21 at 1. The fetal monitor, which "traces" the times when it is connected to the patient, must be connected from the moment a pregnant woman enters the emergency room until she is transferred. Docket No. 106-21 at 1–2. Dr. Matos claimed that Morales was connected the "entire time" she was at the Hospital. Docket No. 106-21 at 1. However, Dr. Matos also acknowledged that there is no way to identify when the fetal monitor was connected to, or disconnected from, Morales. Docket No. 106-23 at 1–2. And while Morales was in the Hospital for approximately 100 minutes, the fetal monitor traced only 50 minutes. Docket No. 106-22 at 1. Of these 50 minutes, Dr. Matos "discarded" part of the tracing because there was "a lot of interference" and "nobody" would be able to use the part he discarded or "issue judgment on it." Docket No. 106-22 at 3–4.

Dr. Matos also testified about the screening procedures that are conducted prior to making the decision to transfer a patient. When determining whether a patient should be transferred, the following are considered: the patient's chief complaint or problem, the "clinical picture," any findings, and the laboratory tests. ASF ¶ 7. Dr. Matos made clear that the laboratory tests must be evaluated before a decision to transfer the patient is made, as well as before any arrangements to transfer the patient are made. Docket No. 160-25 at 1. Once the decision to transfer a patient is made, Dr. Matos adheres to the following procedure. Docket No. 106-8 at 2–3. He first determines the facility that will accept the patient. *Id.* Once that location is determined, Dr. Matos calls the doctor at that facility who will accept the transfer. *Id.* After the doctor at the transferring facility accepts the transfer, arrangements are made to transport the patient.[5] *Id.*

At 2:00 a.m., Dr. Matos evaluated Morales and ordered various laboratory tests (NST, CBC, BMP, U/A, and the patient's blood type and group) and drugs (R/1, Brethine,

---

[5] This was the same procedure followed by Dr. Sanchez when he transferred Morales to the University Hospital in March 2012.

Demerol, and oxygen).[6] RSF ¶ 21; Docket No. 106-6 at 4. Morales testified that her pain worsened while she was in the Hospital, and that she was provided a hospital pad to collect the profuse bleeding. Docket No. 106-32 at 1–3. At 2:15 a.m., the Hospital began making arrangements to transfer Morales to the University Hospital. Docket No. 106-6 at 18. And at 2:30 a.m., Dr. Matos called Dr. Rodriguez to coordinate Morales's transfer to the University Hospital.[7] Docket No. 106-6 at 5 & 6.

At 2:45 a.m., Dr. Matos completed the Hospital's Form for Transfer of Patients ("Transfer Form"). Docket No. 106-6 at 6–8. He wrote the following in a section titled "medical reason for transfer": "hemophilic" patient, "albinism," and "vaginal bleeding." *Id.* at 6. Dr. Matos left blank the sections asking for the benefits of the transfer, the risks of the transfer, and the alternatives to the transfer. *Id.* at 7. Dr. Matos also checked a box that said Morales "was stabilized within a reasonable medical possibility" such that the patient's condition would not deteriorate as a result of the transfer. *Id.* at 6. Notably, Dr. Matos also checked a box which indicated that Morales was "unstable" but the medical benefits of the transfer exceeded the potential risks associated with that transfer. *Id.* at 6. Toward the end of the Transfer Form, Dr. Matos included his signature in the space titled "doctor's name" and certified that he had concluded that the benefits of the transfers outweighed the risks of the transfer. *Id.* at 7–8.

With respect to the portion of the Transfer Form asking the doctor to identify the "treatment offered," Dr. Matos included one illegible note. *Id.* at 7. Dr. Matos acknowledged that he "left . . . out" some of the drugs he administered while Morales was at the Hospital, including Brethine, Vistaril, and Demerol. Docket No. 106-30 at 1–2; Docket No. 106-6 at 29. He claimed, however, that he orally told the ambulance

---

[6] I note that one of the medical forms mistakenly states that this evaluation was conducted at 2:00 *p.m.* rather than 2:00 *a.m.* Docket No. 106-6 at 4.

[7] While the Hospital denies this fact, it does not provide a contrary statement of fact. RSF ¶ 23. In addition, the record citation the Hospital provided to deny the statement in ASF ¶ 23 does not direct the court to record evidence that actually refutes the statement. Docket No. 121-8.

paramedic and intern physician who accompanied Morales on the ambulance about the drugs he administered but did not include in the Transfer Form. Docket No. 106-30 at 2.

A doctor is also required to sign the Hospital's Transfer Checklist ("Transfer Checklist"). Docket No. 106-29 at 1–2. Dr. Matos acknowledged that he did not sign that Transfer Checklist. Docket No. 106-6 at 14; 106-29 at 1–2. And aside from stating that the form pertains to Morales, the Transfer Checklist is blank. Docket No. 106-6 at 14. Dr. Matos also did not sign the Hospital's Authorization for Transfer of Patients Form ("Authorization for Transfer Form"). Docket No. 106-6 at 12–13.

At 3:30 a.m., Morales boarded the ambulance that would transfer her to the University Hospital. SUF ¶ 21. Before being transferred, Morales signed forms indicating that she had been informed of the risks and benefits of the transfer, and that she consented to the transfer. Docket No. 106-6 at 9–10, 12–13. Morales was accompanied by Dr. Vazquez, who "was an intern during her transfer." RSF ¶ 39; ASF ¶ 39. By the time Morales was transferred, most of the laboratory tests Dr. Matos previously ordered were available—as the reports were received at 2:50 a.m. Docket No. 106-6 at 15–17. The results of the following tests were sent with Morales: CBC, BMP, and blood type and group. ASF ¶ 33; RSF ¶ 33. The urine analysis ("U/A") test, however, was never received because the test was never taken. ASF ¶ 19; RSF ¶ 19.

Morales arrived to the University Hospital at 4:18 a.m. SUF ¶ 22; OSF ¶ 22 n.13. At 5:30 a.m., medical staff at the University Hospital noted that Morales was "actively bleeding" after being transferred to their institution, that a pelvic exam revealed that she was three centimeters dilated and 50% effaced, and that an NST test revealed fetal "tachycardia." Docket No. 106-8 at 3. Another note taken by medical staff at 5:30 a.m. states that there was "no obvious active bleeding," though it is unclear whether this note refers to Morales's state at 5:30 a.m. or upon her arrival to the University Hospital. Docket No. 106-8 at 1. Plaintiffs aver that they suffered various damages due to the

Hospital's and Dr. Matos's actions prior to transferring Morales to the University Hospital. Am. Compl. ¶¶ 59–66.

## DISCUSSION

The Hospital and Dr. Matos challenge the court's subject-matter jurisdiction, contend that Morales's EMTALA claims lack merit, urge the court to decline supplemental jurisdiction over the Article 1802 claims, and argue that the *Colorado River* abstention doctrine and Federal Rule of Civil Procedure 19 ("Rule 19") counsel dismissal of this case. *See Colo. River Water Conservation District v. United States*, 424 U.S. 800 (1976); Fed. R. Civ. P. 19(b). Morales maintains that genuine disputes of material fact preclude summary judgment on her EMTALA claims, that the court should exercise supplemental jurisdiction over her state-law claims, and that neither *Colorado River* nor Rule 19 require dismissal.

## I.      Jurisdictional Challenge

At the outset, defendants suggest that there is a "lack of federal jurisdiction for failure to establish" an EMTALA violation "under the uncontested facts." Docket No. 78 ¶ 1; Docket No. 65 at 2. This argument "confound[s] jurisdictional with merits-based issues." *Cruz-Vazquez v. Mennonite Gen. Hosp., Inc.*, 717 F.3d 63, 67 (1st Cir. 2013). In *Cruz-Vazquez*, "the legal assessment of [the plaintiff's] EMTALA claim by both the parties and the court focused on whether" an EMTALA claim was established. *Id.* Yet, the district court employed a "jurisdictional framework" for that assessment. *Id.* The First Circuit held that the lower court erred in "using a jurisdictional framework to assess the merits of [the plaintiff's] EMTALA claim." *Id.* And because the lower court considered materials outside the pleadings, the summary judgment standard—not a jurisdictional framework—was the appropriate rubric under which to assess the plaintiff's EMTALA claim. *Id.* Thus, the summary judgment standard detailed above will be used to assess the EMTALA claims raised here.

## II.    EMTALA

The Act was enacted "in 1996 in response to claims that hospital emergency rooms were refusing to treat patients with emergency conditions but no medical insurance." *Ramos-Cruz v. Centro Medico del Turabo*, 642 F.3d 17, 18 (1st Cir. 2011). "EMTALA therefore 'is a limited anti-dumping statute, not a federal malpractice statute.'" *Id.* (quoting *Reynolds v. Me. Gen. Health*, 218 F.3d 78, 83 (1st Cir. 2000)). The Act "creates private rights of action where hospitals violate [EMTALA's] mandates." *Ramos-Cruz*, 642 F.3d at 18. "The civil enforcement provision of EMTALA applies only to participating hospitals, not physicians." *Alvarez-Torres v. Ryder Mem'l Hosp., Inc.*, 576 F. Supp. 2d 278, 285 (D.P.R. 2008) (citing 42 U.S.C. § 1395dd(d)(2)(A), and collecting cases).

A plaintiff seeking to establish an EMTALA violation "must show (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department; (2) the plaintiff arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition, or (b) released the patient without first stabilizing the emergency medical." *Cruz-Vazquez*, 717 F.3d at 68 (citing *Correa v. Hosp. S.F.*, 69 F.3d 1184, 1189 (1st Cir. 1995) (citations omitted)); *see also Lopez-Soto v. Hawayek*, 175 F.3d 170, 177 (1st Cir. 1999) ("subsections (a) and (b) of EMTALA operate disjunctively").

Morales's amended complaint alleges both screening and transfer violations against the Hospital.[8] Am. Compl. ¶¶ 49, 51. With respect to the EMTALA claims, the Hospital does not challenge Morales's ability to show that the Hospital was covered by EMTALA, that it operates an emergency department, or that Morales arrived to the

---

[8] Dr. Matos argues that plaintiffs cannot maintain EMTALA claims against him. Docket No. 78 ¶ 2. I do not read the amended complaint as stating such claims against him, Am. Compl. ¶¶ 47–51, and plaintiffs' opposition does not suggest otherwise. Docket No. 97. But to the extent any EMTALA claims *are* asserted against Dr. Matos, they are dismissed because "EMTALA applies only to participating hospitals, not physicians." *Alvarez-Torres*, 576 F. Supp. 2d at 285.

Morales-Ramos v. Hospital Episcopal San Lucas Guayama, Inc., Civil No. 13-1614 (BJM)          10

Hospital's emergency room seeking treatment. *See Cruz-Vazquez*, 717 F.3d at 68. Instead, the Hospital contends that Morales was not subjected to disparate screening, that EMTALA does not encompass claims of faulty diagnoses, and that Morales was stabilized before being appropriately transferred to the University Hospital. Docket Nos. 65, 92, 112.

> A.     **Screening Claim**

The Act does not define an "appropriate medical screening examination." *Cruz-Queipo v. Hosp. Espanol Auxilio Mutuo de P.R.*, 417 F.3d 67, 70 (1st Cir. 2005). But under First Circuit law, a "hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints." *Id.* (quoting *Correa*, 69 F.3d at 1192). *Faulty* screening, as opposed to disparate screening or no screening at all, does not contravene the statute. *Correa*, 69 F.3d at 1192–93. The essence of EMTALA's screening requirement "is that there be some screening procedure, and that it be administered even-handedly." *Correa*, 69 F.3d at 1192. Accordingly, when "a hospital prescribes internal procedures for a screening examination, those internal procedures 'set the parameters for an appropriate screening.'" *Cruz-Queipo*, 417 F.3d at 70 (quoting *Correa*, 69 F.3d at 1192); *see also Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 878 & 879 n. 7 (4th Cir. 1992) ("EMTALA only requires hospitals to apply their standard screening procedure for identification of an emergency medical condition uniformly to all patients.").

In some instances, "written hospital screening policies may not exist." *del Carmen Guadalupe v. Negron Agosto*, 299 F.3d 15, 22 (1st Cir. 2002). Such written policies are not "indispensable to EMTALA liability," *id.* at 22 n.4, as a "hospital cannot simply hide behind [a] lack of standard emergency room procedures." *Id.* (quoting *Power v. Arlington Hosp. Assoc.*, 42 F.3d 851, 858 (4th Cir. 1994) (internal quotation marks

omitted)). In *Negron Agosto*, for example, the First Circuit held that the disparate treatment claim did not necessarily fail "because the plaintiffs did not submit the screening policies of" the hospital. 299 F.3d at 22. Rather, this claim failed because plaintiffs offered no "testimony" or other evidence to establish that the hospital deviated from the baseline treatment offered to other similarly situated patients. *Id.*

Moreover, unlike what is required to establish a transfer violation under the statute, a screening violation does not require the plaintiff to "prove that she actually suffered from an emergency medical condition when she first came through the portals of the defendant's facility; the failure appropriately to screen, by itself, is sufficient to ground liability as long as the other elements of the cause of action are met." *Correa*, 69 F.3d at 1189; *see also Cruz-Vazquez*, 717 F.3d at 69. In *Cruz-Vazquez*, for example, a pregnant woman presented symptoms of "vaginal bleeding" in her "third trimester." 717 F.3d at 71. It was uncontested that the plaintiff was suffering from such symptoms, and that these symptoms "were *perceived* by hospital staff as symptoms that would ordinarily trigger the established" hospital protocol. *Id.* Accordingly, the evidence plaintiff proffered did "not go to the failure to properly diagnose based on a faulty screening, but rather to a failure to treat her equally to individuals perceived to have her same condition." *Id.* So viewed, plaintiff could maintain a legitimate EMTALA screening claim. [9] *Id.*

In this case, Dr. Matos testified that it is "protocol" to connect a fetal monitor to "every pregnant woman with over twenty weeks of gestation." This fetal monitor is "always" connected from the moment a patient in such circumstances arrives to the emergency room until she is transferred to another hospital. The Hospital has made no

---

[9] While this case is arguably similar to *Cruz-Vazquez*, Morales did not point to the Hospital's established protocol with respect to someone displaying symptoms of abruptio placentae—the condition Morales claims she was suffering from upon her arrival to the Hospital's emergency room. *See* Docket No. 97; *cf. Cruz-Vazquez*, 717 F.3d at 71. What is more, while Morales did marshal expert testimony to show that abdominal pain and vaginal bleeding are symptoms of abruptio placentae, she did not argue (or present evidence to demonstrate) that Hospital staff *perceived* her to be suffering from this condition. SAF ¶¶ 1–6.

argument whatsoever to establish that such a protocol does not exist, and Morales contends that the Hospital deviated from this protocol on August 10, 2012.

The protocol described by Dr. Matos was applicable to Morales because she had completed 37 weeks of her pregnancy. Morales was in the Hospital's emergency room from 1:50 a.m. to 3:30 a.m. Given the established protocol and the duration of Morales's stay at the Hospital, one would expect the fetal monitor to have recorded approximately 100 minutes of fetal tracing. However, the fetal monitor reflects that only 50 minutes of fetal tracing were recorded. From this evidence, a reasonable jury could infer that Morales was not connected to the fetal monitor—as is required by the established protocol—for the entire time she was at the Hospital's emergency room.[10] To be sure, Dr. Matos maintained that Morales was connected to the fetal monitor the "entire time." And Dr. Matos maintained so even though he acknowledged that one cannot identify when the fetal monitor was connected or disconnected, and that only 50 minutes of fetal tracing were recorded. To the extent the Hospital relies on Dr. Matos's testimony, the testimony serves only to create a genuine dispute of material fact as to whether the Hospital deviated from the standard protocol applicable to "pregnant women with over twenty weeks of gestation."

Moreover, a reasonable jury could find the failure to document Morales's vital signs at certain intervals was indicative of a deviation from the standard protocol—the touchstone of an EMTALA screening claim. According to Dr. Matos, a patient's vital signs are checked and documented when the patient arrives to the Hospital, at each "intervention" by either a nurse or doctor, and before the patient is transferred to another hospital. While Morales's vital signs were checked and documented upon her arrival to the Hospital and before her departure from the Hospital, there are at least three instances

---

[10] Federal Rule of Evidence 803 generally permits a party to introduce the absence of a record of a regularly conducted activity to "prove that the matter did not occur or exist." Fed. R. Evid. 803(7).

where the protocol was not followed. Specifically, the nurses' notes that were entered at 2:15, 2:30, and 2:57 a.m. do not document Morales's vital signs. And Dr. Matos did not document Morales's vital signs at 2:30 a.m.

A reasonable jury could also find that the Hospital did not abide by the screening procedures that must be followed before a doctor makes the decision to transfer a patient. Dr. Matos testified that *before* deciding to transfer a patient or making arrangements to do so, the patient's laboratory tests must be examined. And the arrangements to transfer a patient should be made after the doctor at the Hospital confirms with a doctor at the transferring facility that the patient will be accepted. Here, the Hospital began making arrangements to transfer Morales at 2:15 a.m.—approximately 20 minutes after she arrived to the Hospital's emergency room. Notably, these transfer arrangements commenced before Dr. Matos contacted Dr. Rodriguez to request Morales's transfer to the University Hospital, as well as before Dr. Matos or anyone at the Hospital received Morales's laboratory tests at 2:50 a.m. In sum, because the Hospital has failed to establish that no reasonable jury could find for Morales, summary judgment is denied on the EMTALA screening claim.[11]

   **B.     Transfer Claim**

To establish a violation of EMTALA's transfer provision, "the plaintiff must present evidence that (1) the patient had an emergency medical condition; (2) the hospital actually knew of that condition; (3) the patient was not stabilized before being transferred; and (4) prior to transfer of an unstable patient, the transferring hospital did not obtain the proper consent or follow the appropriate certification and transfer procedures." *Baber*, 977 F.2d at 883; *see also Reynolds*, 218 F.3d at 85 (no duty to stabilize unless hospital "has actual knowledge of the individual's unstabilized emergency

---

[11] While the Hospital acknowledged in its reply brief that an EMTALA screening claim is distinct from a transfer claim, the Hospital homed in on the transfer claim and largely failed to respond to plaintiffs' various arguments relating to the screening claim. Docket Nos. 65, 92, 112.

medical condition") (quoting *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1140 (8th Cir. 1996)). "Subsection (c) [of the Act] delineates the standards for making an appropriate transfer and sets forth procedures for transferring patients who are not stabilized." *Harry v. Marchant*, 291 F.3d 767, 770 (11th Cir. 2002) (citing 42 U.S.C. § 1395dd(c)).

In this case, Morales contends that she was suffering from "abruptio placentae," a premature separation of the placentae that is associated with maternal and perinatal mortality and morbidity, when she arrived to the Hospital's emergency room. ASF ¶ 1; Docket No. 97 at 12. Plaintiff's expert, Dr. Carmen Ortiz Roque, and defendant's expert, Dr. Andres Britt, largely agreed that an abruptio placentae presents a life-threatening, emergency medical condition for the patient and her unborn child. Docket No. 96-11 at 23; Docket No. 106-13 at 1. Notably missing from plaintiffs' statement of facts, however, is any statement pointing to evidence that Dr. Matos or the Hospital's medical staff were actually aware that Morales was suffering from abruptio placentae when she was at the Hospital. *See* SAF ¶¶ 1–40. Indeed, plaintiffs do not suggest that any hospital records indicate that Dr. Matos or the Hospital's medical staff made an abruptio placentae diagnosis before Morales was transferred to the University Hospital. *See* SAF ¶¶ 1–40.

In an attempt to bridge the foregoing deficiency, plaintiffs argue that "Dr. Matos *must have known* that" Morales had an emergency medical condition. Docket No. 97 at 19 (emphasis added). In support of this argument, plaintiffs marshal evidence of the various symptoms Morales was displaying on August 10. *Id.* This argument misses the mark, for it effectively attempts to impose EMTALA liability on a theory that Dr. Matos had constructive knowledge of Morales's emergency medical condition. *See Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 145 (4th Cir. 1996) ("The Act does not hold hospitals accountable for failing to stabilize conditions of which they are not aware, *or even conditions of which they should have been aware*.") (emphasis added); *Baber*, 977 F.2d at 883 ("Analysis by hindsight is not sufficient to impose liability under EMTALA"). In

*Reynolds*, for example, the First Circuit cited the foregoing authority and noted that it "is doubtful" that the text of EMTALA "would support liability under the stabilization provision for a patient who had [a medical condition], absent evidence sufficient to support a finding that the hospital knew of" that condition. *See Reynolds*, 218 F.3d at 85.

The *Baber* court aptly explained why the constructive knowledge theory pressed here lacks merit. 977 F.2d at 883. First, EMTALA "implicitly rejects this proposed standard." *Id.* Indeed, the statute provides that the stabilization provision is applicable if "any individual . . . comes to a hospital *and the hospital determines that the individual has an emergency medical condition*." 42 U.S.C. § 1395dd(b)(1) (emphasis added). Second, the *Baber* court noted that other courts have similarly interpreted the statute. *See Baber*, 977 F.2d at 883 (citing *Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991) (stabilization and transfer provisions "are triggered only after a hospital determines that an individual has an emergency medical condition"); *Cleland v. Bronson Health Care Grp., Inc.*, 917 F.2d 266, 271 (6th Cir. 1990) ("[i]f the emergency nature of the condition is not detected, the hospital cannot be charged with failure to stabilize a known emergency condition"); *Thornton v. Sw. Detroit Hosp.*, 895 F.2d 1131, 1134 (6th Cir. 1990) (EMTALA requires hospitals to give stabilizing treatment "[o]nce a patient is found to suffer from an emergency medical condition")).

As in *Baber*, where summary judgment was appropriate as to the EMTALA transfer claim because the plaintiff "failed to present any evidence that [the defendant-hospital] knew she had an emergency medical condition at the time of her transfer to" the other hospital, summary judgment is appropriate here because plaintiffs have failed to direct the court to evidence indicating that the Hospital knew Morales was suffering from abruptio placentae at the time she was transferred to the University Hospital. *See Baber*, 977 F.2d at 884. To hold otherwise under the circumstances of this case would effectively allow EMTALA to "become coextensive with malpractice claims for negligent treatment." *Vickers*, 78 F.3d at 143, 145 ("the Act does not provide a cause of action for

routine charges of misdiagnosis or malpractice"). Thus, summary judgment is granted as to the EMTALA transfer claim.

## III.  Supplemental Jurisdiction

Morales's amended complaint asserts state-law medical malpractice claims against the Hospital and Dr. Matos. Am. Compl. ¶¶ 51–58. Under Puerto Rico law, a medical malpractice action is fault-based. *Martinez-Serrano v. Quality Health Servs. of P.R., Inc.*, 568 F.3d 278, 285 (1st Cir. 2009). As such, the Puerto Rico Supreme Court has held that malpractice actions are governed by Article 1802 of the Puerto Rico Civil Code. *See, e.g.*, *Ramos Lozada v. Orientalist Rattan Furniture Inc.*, 130 D.P.R. 712, 728 n.10 (P.R. 1992). Article 1802 provides that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. tit. 31, § 5141. To establish medical malpractice under this framework, "a plaintiff must adduce evidence showing at least three separate things: (1) the duty owed, expressed as the minimum standard of professional knowledge and skill required under the circumstances then obtaining; (2) a breach of that duty attributable to the defendant; and (3) a sufficient causal nexus between the breach and the plaintiff's claimed injury." *Rolon-Alvarado v. Municipality of San Juan*, 1 F.3d 74, 77 (1st Cir. 1993).

In this case, defendants have not argued that plaintiffs are unable to establish the elements of a medical malpractice claim. *See Rolon-Alvarado*, 1 F.3d at 77. Instead, defendants contend that the court lacks jurisdiction over the EMTALA claims, and that the court should decline to exercise jurisdiction over the state-law claims. As explained above, the court has jurisdiction over the EMTALA claims. *See supra* Pt. I. And summary judgment is not warranted as to the EMTALA screening claim. *See supra* Pt. II.A. Because the negligence claims against the Hospital and Dr. Matos arise from the same nucleus of operative facts as the EMTALA screening claim, supplemental jurisdiction may be, and will be, exercised over plaintiffs' state-law claims. *See, e.g.*, *Hart v. Mazur*,

903 F. Supp. 277, 281 (D.R.I. 1995) ("the Court, having jurisdiction over [plaintiff's] EMTALA claims against Newport Hospital . . . will exercise its supplemental jurisdiction . . . over all state-law claims against the Hospital, [Dr.] Mazur, and Lewis," a physician's assistant) (internal citations omitted). Accordingly, summary judgment is denied as to the medical malpractice claims against the Hospital and Dr. Matos.

## IV.    Indispensable Parties & *Colorado River*

Highlighting that another action has been filed in state court against the University Hospital, the Hospital and Dr. Matos contend that Rule 19 and the *Colorado River* abstention doctrine counsel dismissal of this action. Docket No. 92. "Rule 19(b) provides that, if a nonparty is deemed necessary to litigation but joining that nonparty would deprive the court of jurisdiction, the court should permit the action to proceed only to the extent that 'equity and good conscience' warrant." *B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc.*, 440 F.3d 541, 547 (1st Cir. 2006) (*Kellogg I*). "Federal Rule of Civil Procedure 19(b) specifies four factors to guide the indispensability inquiry." *B. Fernandez & HNOS, Inc. v. Kellogg USA, Inc.*, 516 F.3d 18, 23 (1st Cir. 2008) (*Kellogg II*). These four factors include: "(1) To what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; (2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; (4) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder." *Id.* (quoting Fed. R. Civ. P. 19(b)).

In this case, the court's subject-matter jurisdiction is based on a federal question––not diversity of citizenship—and so defendants fail to demonstrate that joining other parties would deprive the court of jurisdiction. *See, e.g.*, *Parikh v. Franklin Med. Ctr. Inc.*, 163 F.R.D. 167, 169 (D. Mass. 1995) (party could be joined without running afoul of Rule 19 where defendant was "not attempting to add a party which could destroy th[e] Court's jurisdiction, since jurisdiction [was] not based on diversity but a federal

question"). Indeed, defendants fail to show that the court could not exercise supplemental jurisdiction over claims against parties other than the Hospital—as was precisely done with the Article 1802 claim against Dr. Matos.

Even if the court considered Rule 19(b)'s factors with respect to the Article 1802 claim, those factors do not counsel dismissal in this case. With respect to the first and third factors of Rule 19(b), defendants contend that an adverse ruling against them could "as a practical matter" impair the University Hospital's "probability of success" in the state court action because plaintiff alleges in both actions that the defendants should have conducted a caesarean section. Docket No. 92 at 7. But even if it could be argued that such a circumstance means the Hospital and the University Hospital are joint tortfeasors, the argument ultimately lacks merit—for "it has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." *Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990). And nothing in Rule 19 changed this principle. *See id.* As to Rule 19(b)'s second factor, the court could limit any judgment to the defendants in this case without implicating any defendants that have not been joined. The fourth factor arguably weighs in defendants' favor, as there is no reason to suggest that a state court could not provide the plaintiffs with an adequate remedy in the event they prevailed. While one factor arguably weighs in favor of defendants, the remaining Rule 19(b) factors militate against dismissal. Thus, dismissal under Rule 19(b) is unwarranted.

Defendants' argument that the *Colorado River* abstention doctrine counsels dismissal fares no better. 424 U.S. at 817–20. "Parallel litigation is not uncommon in our federal system and '[i]t has long been established that the presence of parallel litigation in state court will not in and of itself merit [a stay] in federal court.'" *Bacardi Int'l Ltd. v. V. Suarez & Co.*, 719 F.3d 1, 14 (1st Cir. 2013) (quoting *Jimenez v. Rodriguez-Pagan*, 597 F.3d 18, 27 (1st Cir. 2010)). "Concurrent federal-state jurisdiction over the same controversy does not generally lessen the federal courts' 'virtually unflagging obligation . . . to exercise the jurisdiction given them.'" *Jimenez*, 597 F.3d at 27 (quoting *Colo. River*,

424 U.S. at 817). However, in special cases "the pendency of a similar action in state court may merit federal abstention based on 'considerations of wise judicial administration' that counsel against duplicative lawsuits." *Jimenez*, 597 F.3d at 27 (quoting *Colo. River*, 424 U.S. at 817).

The *Colorado River* abstention doctrine carved a "narrow" crevice in federal jurisdiction, and of "all the abstention doctrines, it is to be approached with the most caution, with '[o]nly the clearest of justifications' warranting dismissal." *Jimenez*, 597 F.3d at 27 (quoting *Colo. River*, 424 U.S. at 819). The "exceptional-circumstances test" confines the court's authority to find such clear justifications. *See Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 16 (1983); *Jimenez*, 597 F.3d at 27 ("cases that satisfy this test are few and far between"). Under this test, eight non-exclusive factors are considered: "(1) whether either court has assumed jurisdiction over a res; (2) the [geographical] inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether state or federal law controls; (6) the adequacy of the state forum to protect the parties' interests; (7) the vexatious or contrived nature of the federal claim; and (8) respect for the principles underlying removal jurisdiction." *Rio Grande Cmty. Health Ctr. v. Rullan*, 397 F.3d 56, 71–72 (1st Cir. 2005). "No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counseling against that exercise is required." *Colo. River*, 424 U.S. at 818–19.

A careful balancing of the exceptional-circumstances test's eight factors reveals that this is not a special case warranting abstention under the *Colorado River* doctrine. First, this court has not assumed jurisdiction over a res, and the parties agree that a res is not implicated in the state court action. The parties also agree that the federal and Puerto Rico forums are equally convenient. *See Jimenez*, 597 F.3d at 28. With respect to the third factor, defendants suggest that allowing this suit to continue will result in piecemeal

litigation. But even assuming for the moment that the Hospital, Dr. Matos, and the University Hospital were properly considered join tortfeasors, this suit concerns only the Hospital and Dr. Matos. Accordingly, the court could accord relief to Morales, in the event she prevails, without waiting for the conclusion of the state-court action against the University Hospital. As to the fourth factor, it is undisputed that the state-court action against the University Hospital was filed before this action. Because federal law controls plaintiffs' EMTALA claim but state-law controls their Article 1802 claim, the fifth factor is arguably in equipoise.

With respect to the sixth factor, both the state and federal forums are adequate to protect the parties' interests—as discussed above. *See United States v. Fairway Capital Corp.*, 483 F.3d 34, 43 (1st Cir. 2007) (adequacy of the state forum is relevant only when it would disfavor abstention). As to the seventh factor, defendants argue that plaintiffs attempt to shoehorn an EMTALA claim in order to get this case into federal court. But because a reasonable jury could find that plaintiffs raised a legitimate EMTALA claim, there is nothing contrived or vexatious about the claims brought in this case. The eighth factor, respect for the principles removal jurisdiction, is not implicated in this case. Having carefully weighed each of the eight factors, I conclude that abstention under the *Colorado River* doctrine is unwarranted here.

## CONCLUSION

For the foregoing reasons, summary judgment is **GRANTED IN PART AND DENIED IN PART.** The EMTALA transfer claim, 42 U.S.C. § 1395dd(b), is **DISMISSED WITH PREJUDICE**. The EMTALA screening claim against the Hospital, 42 U.S.C. § 1395dd(a), and the state-law medical malpractice claims against the Hospital and Dr. Matos remain. P.R. Laws Ann. tit. 31, § 5141.

Morales-Ramos v. Hospital Episcopal San Lucas Guayama, Inc., Civil No. 13-1614 (BJM)                    21

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 13th day of September 2016.

*S/ Bruce J. McGiverin*

BRUCE J. McGIVERIN
United States Magistrate Judge